# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information Associated with the Cellular Telephone<br>Number Assigned Call Number (614) 377-7311 that is<br>Stored at Premises Controlled by T-Mobile US, Inc. | )<br>)<br>)<br>)<br>)<br>)    Case No.   2:22-mj-692 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A to the Affidavit in Support of the Application, incorporated here by reference.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B to the Affidavit in Support of the Application, incorporated here by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| (1) 21 U.S.C. § 841(a)(1) | (1) Distribution and Possession with Intent to Distribute Controlled Substances |
| (2) 18 U.S.C. §§ 922(g)(1) and 924(a)(2) | (2) Felon in Possession of a Firearm |

The application is based on these facts:

See Affidavit in Support of the Application, incorporated here by reference.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Matthew J. Voytek IV*
_____
*Applicant's signature*

Matthew J. Voytek IV, Special Agent, ATF
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   October 14, 2022
_____

_____
Kimberly A. Jolson
United States Magistrate Judge

City and state:   Columbus, Ohio
_____

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (614) 377-7311 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE US, INC. | Case No. ___2:22-mj-692___<br><br>**FILED UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Voytek, Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. 2703(c)(1)(A) for information associated with the cellular telephone assigned call number (614) 377-7311 ("the **TARGET PHONE**"), whose service provider is T-Mobile US, Inc. ("T-Mobile"), a wireless telephone service provider headquartered at 3625 132nd Avenue SE, Bellevue, Washington.  The **TARGET PHONE** is described herein and in Attachment A, and the information to be disclosed by T-Mobile and seized by the government is described herein and in Attachment B.

2.     Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3121(b)(1).

3. I am a Special Agent with the ATF and have been since January 2021. I have experience in the investigation, apprehension, and prosecution of individuals involved in federal and state criminal offenses, the use of cellular devices to commit those offenses, and the available technology that law-enforcement officers can use to assist in identifying the users of cellular devices and their location. During my employment with ATF, I have assisted with investigating criminal violations relating to firearms, drug trafficking, and violent crime. I have participated in various aspects of criminal investigations, including interviews, physical surveillance, and the execution of search warrants. I am familiar with and have participated in investigative methods including electronic surveillance, search warrants, and the use of confidential informants.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm) [collectively, the "**SUBJECT OFFENSES**"] have been committed, are being committed, and will continue to be committed by Brett E. Collins and other unknown persons. There is also probable cause to believe that the information described in Attachment B will constitute evidence of those criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

6.     This Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 US.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the controlled-substance and firearm offenses being investigated.  *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.     In August of 2022, ATF Confidential Informant #31219 ("CI #31219") advised investigators that an armed drug trafficker named Brett Collins (a/k/a "BJ") deals fentanyl, pills, and marijuana in central Ohio.  As a result, the ATF Columbus Field Office commenced an investigation into Collins, who is a convicted felon.[1]

8.     Between August 17 and October 5, 2022, Collins used the **TARGET PHONE** to discuss, arrange, and consummate the sale of roughly 618.88 grams of suspected marijuana, 229 Percocet pills, 116.26 grams of suspected cocaine, and fifteen firearms to an ATF Special Agent working in an undercover capacity through nine separate recorded deals.

### A.  The First Deal – Sale of Marijuana

9.     Between August 17-18, 2022, CI #31219 corresponded with Collins via cell phone regarding Collins selling narcotics to a third-party – in truth, an ATF Special Agent who was working undercover ("SA #6134").  Collins used the **TARGET PHONE** to communicate with CI #31219 during those conversations.  The following summaries do not purport to be a complete transcription of the conversations between Collins and CI #31219 on August 17th and 18th, but only a synopsis of the pertinent facts and conversation.

---

[1] I have queried the Franklin County Clerk of Courts' Website and learned that Collins was convicted of a felony offense for improper handling of a firearm (F4) in Case No. 20-cr-063. Judgment was imposed for that conviction on or about June 15, 2020.

10.     On or about August 18th, Collins, using the **TARGET PHONE**, informed CI #31219 that he had multiple ounces of marijuana to sell.  Collins provided the amount of marijuana and the sales price before following up twice to determine whether the CI and the third-party (the undercover agent) wanted to purchase the marijuana.  Later that same day (August 18th), Collins agreed to sell the marijuana to SA #6134.

11.     Continuing the same day, Collins arrived at a pre-determined location for the purpose of providing the undercover agent with a pre-agreed upon amount of marijuana. SA #6134 arrived with pre-recorded buy money, and the deal was recorded by audio and video devices.  Collins and CI #31219 arrived together in a vehicle; the CI was driving, while Collins was the front-seat passenger.  Collins and the CI then exited the vehicle.  SA #6134 observed Collins with a black sling bag in his possession upon exiting the vehicle.  Collins was also on his phone upon his arrival.  Collins then produced a clear bag of suspected marijuana from his sling bag and provided it to SA #6134.  The agent placed the bag on a scale and observed that it weighed roughly 4.6 ounces.  SA #6134 then asked Collins the sales price, and Collins responded $600.00.  Collins and the agent ultimately agreed upon a purchase price of $550.00 for the roughly 4.6 ounces of marijuana.  SA #6134 paid Collins a total of $550.00 in undercover funds which Collins counted, acknowledged, and took into his possession.

12.     During this first deal, Collins indicated to the undercover agent that he has sold firearms in the past and could sell firearms moving forward.  The offer to sell firearms could amount to a separate federal offense since Collins is prohibited from possessing firearms due to his status as a convicted felon.  *See* 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

### B. The Second Deal – Sale of Percocet Pills and Marijuana

13.    Between August 20-24, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of more controlled substances. Between those dates, Collins texted the undercover agent prices for marijuana and explained that he could sell a quarter pound of marijuana for $500.00 and a half-pound of marijuana for $850.00.

14.    On August 22, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 via text message. Collins stated that he had Percocet 30 pills for sale. Collins explained that he could sell 100 Percocet 30 pills for $2,300.00; 20 Percocet pills for $550.00; or 10 Percocet pills for $300.00.

15.    Between August 23-24, 2022, Collins, using the **TARGET PHONE**, continued to correspond with SA #6134 regarding their next drug deal. Collins ultimately agreed to sell 20 Percocet pills and four ounces of marijuana.

16.    On August 24, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the controlled substances. This deal again involved pre-recorded funds and was again recorded by audio and video devices. This time, Collins arrived alone. Collins exited the vehicle and greeted both the undercover agent and CI #31219, who was also at the undercover location already. SA #6134 again observed Collins with a black sling bag in his possession upon arrival. Collins opened the bag and handed SA #6134 a black plastic bag containing suspected marijuana. Collins then provided the agent twenty suspected Percocet pills which he retrieved from the same black sling bag. SA #6134 weighed the suspected marijuana on a scale and determined it to be roughly 4.4 ounces. Collins and the agent ultimately agreed on a purchase price of $1,100.00. SA #6134 then paid Collins a total of $1,100.00 in undercover funds which Collins counted, acknowledged, and took into his possession.

17.     During the second deal, Collins again indicated to the undercover agent that he has sold firearms in the past and could sell firearms to the agent in the future.    After that conversation, Collins, the agent, and CI #31219 exchanged departures.

### C. The Third Deal – Sale of a Firearm, Percocet Pills, and Marijuana

18.     Between August 24-29, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of more controlled substances and a firearm.

19.     On August 28, 2022, Collins, using the **TARGET PHONE**, texted SA #6134 about selling a Taurus 1911 pistol, Percocet pills, and marijuana.

20.     On August 29, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the gun and the drugs.  This deal likewise involved pre-recorded funds and was recorded by audio and video devices.  This time, Collins was the driver, but he was accompanied by an unknown black female riding in the front passenger seat.  Collins exited the vehicle and greeted SA #6134.  Collins immediately popped the trunk of the vehicle and retrieved a black gun case from within the trunk.   Collins gave the gun case and a black holster to SA #6134. Collins then retrieved a small bag of twenty-five Percocet pills and handed it to the agent.  Collins then went back to the vehicle and retrieved a black plastic bag which contained suspected marijuana.  Collins handed the bag to SA #6134 and stated that it contained 2.5 ounces.  While this conversation occurred, SA #6134 counted the Percocet pills and weighed the suspected marijuana, which came out to roughly 2.6 ounces.  Collins then stated to the agent, "$250.00 for that (marijuana), and $25.00 a piece (Percocet pills) . . . and then the gun is $475.00."  SA #6134 counted out a total of $1,300.00 and handed it to Collins, who then departed.  The firearm was later determined to be a Taurus 1911, 9mm pistol, bearing serial number ACA414149.

**D.  The Fourth Deal – Sale of a Firearm, Percocet Pills, and Marijuana**

21.    Between August 29-31, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of more controlled substances and a firearm.

22.  On August 29, 2022, Collins, using the **TARGET PHONE**, texted SA #6134 about selling an American Tactical Moxie pistol, Percocet pills, and marijuana.

23.  On August 31, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the gun and the drugs.  This deal likewise involved pre-recorded funds and was recorded by audio and video devices.  Collins was the driver and lone occupant.  Collins exited the vehicle with a black sling style bag and greeted SA #6134.  Collins immediately popped the trunk of the vehicle and retrieved a black gun case from within the trunk.   Collins entered the office are of the undercover location. COLLINS opened his black sling style bag and pulled out a bag of suspected marijuana and a small bag of twenty-five Percocet pills and handed it to the agent. SA #6134 counted the Percocet pills and weighed the suspected marijuana, which came out to roughly 2.6 ounces.  Collins then stated to the agent, "So $650.00 on the pills, $600.00 on the gun, take a thousand off for ya, and then ugh, just give me $225.00 on the weed." SA #6134 stated "so $1,475.00?" COLLINS then stated, "yep yep." SA # 6134 counted out a total of $1,475.00 and handed it to Collins, who then departed.  The firearm was later determined to be an American Tactical Moxie, .45 caliber pistol, bearing serial number FX003054.

**E.  The Fifth Deal – Sale of Two Firearms and Percocet Pills**

24.    Between August 31, 2022, and September 2, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of two firearms and a controlled substance.

25. On September 1, 2022, Collins, using the **TARGET PHONE**, texted and called SA #6134 about selling two pistols (a Sig Sauer P320 and a FNH USA, FNS-40) and some Percocet pills.

26. On September 2, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the guns and the drugs. This deal likewise involved pre-recorded funds and was recorded by audio and video devices. Collins was the driver and lone occupant. Collins exited the vehicle and greeted SA #6134. Collins immediately popped the trunk of the vehicle and stated to the SA # 6134, "you wanna grab them out of the trunk, should be two of them." SA #6134 then retrieved a shoe box and a black and blue gun case from within the trunk area as Collins then joined him and showed him the firearms. SA # 6134 examined the two firearms. Collins then retrieved a small bag of fifty Percocet pills and placed it on the ottoman for SA# 6134. SA #6134 counted the Percocet pills as Collins loaded one of the firearms and said to SA #6134, "tell them when you sell it to unwind it" (commenting on the drum magazine). SA #6134 then counted out a total of $2,450.00 and handed it to Collins. Collins shortly after departed the undercover location. The firearms were later determined to be a Sig Sauer P320 M17 9mm pistol bearing serial number M17-081336 and a FNH USA, FNS -40 .40 caliber pistol bearing serial number GKU0123475.

**F. The Sixth Deal – Sale of Four Firearms, Percocet Pills, Cocaine, and Marijuana**

27. Between September 4-8, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of four firearms and more controlled substances.

28. On September 6, 2022, Collins, using the **TARGET PHONE**, texted and called SA #6134 about selling two pistols (a Glock 19 and a Glock 23), some Percocet pills, and marijuana

8

29.  On September 8, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the guns and the drugs.  This deal likewise involved pre-recorded funds and was recorded by audio and video devices.  Collins was the driver and lone occupant.  Collins exited the vehicle and greeted SA #6134.  Collins was immediately observed with a black sling style bag and a white plastic bag.  Collins and SA # 6134 sat down, and Collins opened the white plastic bag presenting different types of suspected marijuana.  Collins then obtained his black sling bag and opened it up on his lap.  Collins retrieved from the black bag two firearms.  Collins briefly explained the firearms to SA #6134 before pulling out a small plastic baggy containing twenty-five Percocet pills from his black sling bag.  SA #6134 opened the bag of Percocet pills and counted them.  SA #6134 then retrieved $2,000.00 from his pocket and began counting it.  Collins then stated the price for all the items to be purchased was $2,200.00.  SA #6134 placed $2,000.00 on the ottoman for Collins.  SA #6134 then retrieved $200.00 and handed it to Collins to count.  Shortly after, Collins entered back into his vehicle and departed the area.  The firearms were later determined to be a Glock 19 9mm pistol bearing serial number BTXD613 and a Glock 23 .40 caliber pistol bearing serial SMR121.

30.  Later that day, Collins, using the **TARGET PHONE**, corresponded with SA #6134 about selling another two pistols (a Glock 31 and a Glock 30), some Percocet pills, and cocaine.  On the same day, Collins arrived again at a pre-determined location to provide SA #6134 with the additional guns and the drugs.  This deal likewise involved pre-recorded funds and was recorded by audio and video devices.  Collins was the driver and Cherese Walker, who was later identified, was in the front passenger seat.  Collins immediately popped the trunk of the vehicle.  Collins then exited the car and greeted SA #6134 before retrieving a multi-colored plastic bag from the trunk.  Walker then exited the front passenger seat of the vehicle.  Collins walked into

the office of the undercover location and retrieved a black sling bag and two firearm boxes from within the multi-colored plastic bag and sat them on the desk in the office. SA #6134 examined the firearms. SA #6134 then examined the thirteen Percocet pills and took out a scale to weigh the suspected cocaine, which weighed approximately 4.19 grams. SA #6134 negotiated a price for the items. Subsequently SA #6134 and Collins agreed upon a price of $1,950.00 for the two firearms, the pills, and the suspected cocaine. Collins shortly after departed the undercover location with Walker. The firearms were later determined to be a Glock 31 .357 caliber pistol bearing serial number YEY230 and a Glock 30 .45 caliber pistol bearing serial YWK667.

**G. The Seventh Deal – Sale of Four Firearms, Percocet Pills, Cocaine, and Marijuana.**

31.    Between September 8-20, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of four firearms and multiple controlled substances.

32.  On September 9 and 19, 2022, Collins, using the **TARGET PHONE**, texted and called SA #6134 about selling three pistols (a HK P320, a Glock 42, and a Glock 19X), some Percocet pills, cocaine, and marijuana.

33. On September 19, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the guns and the drugs. This deal likewise involved pre-recorded funds and was recorded by audio and video devices. Collins exited the driver seat of a black Dodge Charger and greeted SA #6134. Collins was carrying a black sling style bag. Cherese Walker exited the front passenger seat of the auto. SA #6134 then observed a *silver* Dodge Charger pull into the undercover location and park behind Collins. Collins then popped the trunk of the black Dodge Charger and began to retrieve three gun boxes. SA #6134 observed an older black male who was subsequently identified as Robert Haley, appear from the silver Dodge Charger. As Collins,

Haley, and SA #6134 were standing outside the trunk of the black Charger, Collins began looking around and asked Haley, "where is it at?" Haley responded, "gas tank." Collins then walked over to the silver Dodge Charger, remotely popped the gas cap, and quickly retrieved a baggy of suspected cocaine from within the gas cap before placing it into his front shorts pocket. Collins then walked back into the office of the undercover location and placed the gun boxes and the suspected cocaine on the desk. Collins also retrieved a clear bag of Percocet pills and a jar of marijuana from within his black sling style bag and presented it all to SA #6134. SA #6134 weighed the suspected cocaine and observed it to weigh 27.77 grams. SA #6134 pulled out $1,250.00 and handed it to Collins. Collins counted the money and confirmed the amount. Collins then handed the $1,250.00 dollars to Haley for the sale of the cocaine. The order of business then turned towards the firearms, marijuana, and pills. SA #6134 negotiated the price of the aforementioned items with Collins and agreed upon a price of 2,560.00 as the total price for the HK P320, the Glock 42, and the Glock 19X. After the exchange of currency from SA #6134 to Collins, all parties departed the undercover location. The firearms were later determined to be an HK P320 .40 caliber pistol bearing serial number 219-016958, a Glock 42 .380 Auto caliber pistol bearing serial number ACKK184, and a Glock 19X 9mm pistol bearing serial number BHDU371.

34. Later that day, Collins, using the **TARGET PHONE**, continued corresponding with SA #6134 via text regarding the sale of another firearm to SA #6134, after the initial deal. Collins texted SA #6134 that he forgot he had an AR pistol that he could sell. SA #6134 agreed to purchase the firearm from Collins and told Collins to drive back to the pre-determined location to provide SA #6134 with the gun.

35. Still later that day, Collins arrived at a pre-determined location to provide SA #6134 with the AR pistol. This deal likewise involved pre-recorded funds and was recorded by audio and video devices. Collins arrived at the undercover location in the silver Dodge Charger. Collins was the driver and Walker was the passenger. Collins and Walker exited the vehicle and greeted SA #6134. Collins then remotely popped the trunk of the vehicle and removed a Palmetto State Armory AR pistol from within a pair of jeans that was in the trunk of the vehicle. Collins then handed the firearm to SA #6134, who examined the gun. SA #6134 began to retrieve money from his pocket. SA # 6134 stated to Collins, "you got change for a ten, two fives or something?" Collins responded, "yea." Collins ultimately said, "what you got right there?" SA #6134 responded, "$770.00." Collins responded, "just keep it like that." SA #6134 then gave Collins the money. Collins put the money in his pocket and shortly after, he exchanged goodbyes before departing with Walker in the Silver Dodge Charger. The firearm was later determined to be a Palmetto State Armory AR pistol 300 blackout bearing serial number PA107011.

**H. The Eighth Deal – Sale of One Firearm, Percocet Pills, Cocaine, and Marijuana**

36. Between September 8-20, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of one firearm and multiple controlled substances.

37. On September 23, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 via text message about the sale of one Ruger P89 pistol, twenty-four Percocet pills, an ounce of cocaine, and four ounces of marijuana.

38. On September 28, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the guns and the drugs. This deal likewise involved pre-recorded funds and was recorded by audio and video devices. Collins arrived at the undercover location in a white GMC

12

SUV. Collins exited the right rear passenger seat. Robert Haley, who was previously identified, was the driver, and Ashley Collins who was later subsequently identified, was the front passenger. Cherese Walker, who was previously identified, was in the left rear passenger seat. All occupants exited the vehicle and greeted SA #6134. Haley handed Collins an air-sealed bag of marijuana. Collins reached into a white backpack that Walker was holding and pulled out a Ruger pistol and a clear bag of suspected cocaine. Collins began adding up the prices of the items. Collins arrived at a price of $925.00 for the pistol and suspected marijuana; $1,250.00 for the suspected cocaine; and $625.00 for the Percocet pills. SA #6134 provided Collins with $2,800.00 for the gun and drugs. Shortly after, all occupants from the white SUV departed from the pre-arranged location.

### I. The Ninth Deal – Sale of Two Firearms, Cocaine, and Marijuana

39. Between September 28, 2022, and October 5, 2022, Collins, using the **TARGET PHONE**, corresponded with SA #6134 regarding the sale of two firearms and multiple controlled substances.

40. Between September 28, 2022, through October 3, 2022, Collins, using the **TARGET PHONE**, texted SA #6134 about selling two pistols (a Freedom Ordinance, Model FX-9 and a Smith & Wesson Airweight revolver) along with cocaine and marijuana.

41. On October 5, 2022, Collins arrived at a pre-determined location to provide SA #6134 with the guns and the drugs. This deal likewise involved pre-recorded funds and was recorded by audio and video devices. Collins arrived in a silver Dodge Charger. He was the driver and lone occupant. Collins exited the vehicle and advised SA #6134, "Hey waiting on my big brother to pull up, hr talking about 30-40 min on his bike…he got the Goldwing." Collins then opened the rear left passenger's door and obtained a large pillowcase and a black backpack.

Collins entered the office and removed clear bags of marijuana from within the black backpack and presented them to SA #6134. Collins then opened the pillowcase and pulled out a Smith & Wesson Airweight .38 special revolver and placed it on the desk. Collins then pulled out a Freedom Ordinance, Model Fx-9 9mm pistol from within the pillowcase and presented it to SA #6134. Collins and SA #6134 began discussing the price for the aforementioned items to include marijuana that was also presented to SA #6134. Collins eventfully came to an agreement with SA #6134 on a price of $1,300.00 for the two firearms and $440.00 for the marijuana. Collins received $1740.00 for all the items and placed the money in his pocket. Shortly after, Robert Haley arrived on his motorcycle. Haley got off the motorcycle and Collins sat back on the motorcycle. While on the motorcycle, Collins retrieved two bags of suspected cocaine from the center console and placed them in his back pocket. Collins eventually walked back into the office where he discussed the price of the two ounces of suspected cocaine. Collins agrees to a price of $2,500.00. SA #6134 then paid Collins $2,500.00 for the suspected cocaine. After the transaction, all parties left the office and said their goodbyes.

42. In consulting with other ATF agents who are trained in determining the manufacturing origin of firearms, I learned that all the firearms purchased from Collins in an undercover capacity were not manufactured in the State of Ohio. Therefore, the firearms that Collins sold to SA #6134 travelled in and affected interstate and/or foreign commerce prior to Collins's possession of those firearms.

### D. The TARGET PHONE'S Relationship to the Alleged Criminal Activity

43. As detailed above, Collins used the **TARGET PHONE** to facilitate multiple unlawful sales of controlled substances and firearms that he was prohibited from possessing by federal law.

14

44.     In addition, I know through training and experience that cellular telephones are commonly used, or have a relationship to, unlawful acts such as those described in this affidavit. For example, I know that cellular telephones are commonly in the physical possession of their owners/users, which could yield information regarding the who, what, when, where, and why of the **SUBJECT OFFENSES**, including information about how Collins came into possession of the marijuana, cocaine, Percocet pills, and the firearms; from whom he obtained those drugs and the firearms; when he took possession of those items; where he was located when he obtained those items; to whom else he might have marketed those drugs, the firearms, or other unlawful contraband; and other actions he may have taken in furtherance of his criminal activity.

45.     Information obtained from this warrant will be used to determine the location of the **TARGET PHONE** in relation to the deals and **SUBJECT OFFENSES** described above. Investigators believe that the information sought will provide other locations of interest to this investigation relevant to Collins and will also assist investigators in determining his whereabouts, conducting surveillance, and further establishing his pattern of activity and the patterns of activity of others who may be involved in these offenses.

### E-911 PHASE II DATA AND CELL-SITE DATA

46.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data; and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.

47.    E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

48.    Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

49.    Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **TARGET PHONE**, including by initiating a signal to determine the location of the **TARGET PHONE** on T-Mobile's network or with such other reference points as may reasonably be available.

50.    Based on my training and experience, I know that T-Mobile can collect cell-site data about the **TARGET PHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

51.     The GPS and cell-site data described above are imperative in this investigation due to the difficulty in conducting surveillance on individuals engaged in armed drug trafficking. The ability to safely locate the **TARGET PHONE** while Collins is engaged in criminal activity is important to obtaining evidence for prosecution and for executing an arrest.

## AUTHORIZATION REQUEST

52.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c), authorizing the acquisition of the information described in Attachment B for a period of thirty days.

53.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until thirty days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **TARGET PHONE** would seriously jeopardize an ongoing investigation, as such disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See id.*

54.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference to T-Mobile's services, including by initiating a signal to determine the location of the **TARGET PHONE** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

55.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET PHONE** outside of daytime hours.

56.     In accordance with this Court's local rules and standing orders, I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## CONCLUSION

57.     Based on the facts set forth in this affidavit, there is probable cause to believe that Brett Collins, a convicted felon and known drug trafficker, did knowingly commit the **SUBJECT OFFENSES**.  There is also probable cause to believe that the information sought in

this warrant will assist in identifying previous locations corresponding to dates and times that Collins committed those offenses. Furthermore, the information sought will assist in locating Collins in an effort to obtain further evidence of those offenses and will assist agents in determining his general location.

Respectfully submitted,

*Matthew J. Voytek IV*

Matthew Voytek, Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Subscribed and sworn to before me this _____ day of October, 2022.



Kimberly A. Jolson
United States Magistrate Judge

## Attorney Certification Under 18 U.S.C. §§ 3121-3127

To ensure technical compliance with the Pen Register Act, 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order. I, an attorney for the Government, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the ATF. *See* 18 U.S.C. §§ 3122(b), 3123(b).

s/Noah R. Litton

Noah R. Litton
Assistant United States Attorney
Southern District of Ohio

## ATTACHMENT A

**Property to Be Searched**

1. This warrant applies to records and information associated with the cellular telephone assigned call number (614) 377-7311 (the "**TARGET PHONE**"), that are stored at premises controlled by the wireless service provider (T-Mobile), a company headquartered at 3625 132nd Avenue SE, Bellevue, Washington.

2. The requested records and information associated with the **TARGET PHONE** that are described more fully in the accompanying affidavit and in Attachment B that are within the possession, custody, or control of T-Mobile.

## ATTACHMENT B

### Particular Things to Be Seized

**I.      Information to Be Disclosed by the Provider (T-Mobile)**

**A.  Location Data to Be Disclosed by the Provider**

All information about the location of the **TARGET PHONE** described in Attachment A for a period of thirty days, during all times of day and night.  "Information about the location of the **TARGET PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government.  In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **TARGET PHONE** on T-Mobile's wireless network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T- Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a (b)(2).

**B. Additional Records and Other Information to Be Disclosed by the Provider**

T-Mobile is also required to disclose to the government the following records and information concerning the **TARGET PHONE** described in Attachment A, if those records and information are within the possession, custody, or control of the company, for the time period of August 18, 2022, through the date this warrant is issued:

Customer/Subscriber Information

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

3. Local and long-distance telephone connection records;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ["IP"] addresses) associated with those sessions;

5. Length of service (including start date) and types of services utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ["ESN"], Mobile Electronic Identity Numbers ["MEIN"], Mobile Equipment Identifier ["MEID"], Mobile Identification Numbers ["MIN"], Subscriber Identity Modules ["SIM"], Mobile Subscriber Integrated Services Digital Network Number ["MSISDN"], International Mobile Subscriber Identifiers ["IMSI"], or International Mobile Equipment Identities ["IMEI"]);

7. Other subscriber names or identities (including the registration Internet Protocol ["IP"] addresses); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

22

<u>Other Records and Information from August 18, 2022, to current, including</u>

1. Information about each communication sent or received by the **TARGET PHONE**, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

2. All data about which "cell towers" (i.e, antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the **TARGET PHONE**.

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm).